

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AFM:EHS

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 5, 2025

By ECF

The Honorable Vera M. Scanlon
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Sergei Zharnovnikov
                Docket No. 25-MJ-12

Dear Judge Scanlon:

      The government writes regarding defendant Sergei Zharnovnikov, who has been charged in the above-referenced complaint (the "Complaint") for selling arms to a Russian company in violation of U.S. law. As described in the Complaint and herein, the defendant presents a serious flight risk—he is a citizen of Kyrgyzstan, who only traveled to the United States to attend the Shooting, Hunting, and Outdoor Trade Show ("SHOT") Show in Las Vegas, and had a plane ticket to return to Kyrgyzstan on January 27, 2025. Notably, the United States does not have an extradition treaty with Kyrgyzstan. The government therefore moves for an order of detention pending trial.

I.      Relevant Background[1]

      A.      The Offense Conduct

      The defendant is a citizen of Kyrgyzstan and an international arms dealer. Specifically, the defendant is the General Director and owner of "Kyrgyzstan Company-1," an arms dealer located in Bishkek, Kyrgyzstan. "Russian Company-1," an arms dealer located in Moscow, Russia, identified Kyrgyzstan Company-1 as its "partner company" in a 2018 correspondence. Kyrgyzstan Company-1 and a second arms dealer located in Bishkek, "Kyrgyzstan Company-2," appear to be closely related. In addition to the transactions described below, the defendant's wife ("Spouse-1") is a fifty percent owner of Kyrgyzstan Company-2.

---

[1]      Detailed herein is a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

Since at least March 2020, the defendant together with others, conspired to export from the United States to Russia firearms that required a license from the United States Department of Commerce ("DOC"). As described in greater detail below, the defendant used Kyrgyzstan Company-1 to acquire export-controlled firearms from the United States, and then transferred them to Kyrgyzstan Company-2 for reexport to Russia.

Specifically, on or about February 2, 2020, the defendant, using Kyrgyzstan Company-1, entered a five-year, $900,000 contract with a company in the United States ("U.S. Company-1") wherein U.S. Company-1 would sell Kyrgyzstan Company-1 "hunting shotguns and rifles, pistols, spare parts and accessories" (hereinafter the "U.S. Company-1 Contract"). These firearms included semi-automatic hybrid rifle-pistols from U.S. Company-1, which required a license for export to Russia (and Kyrgyzstan) from DOC during the time period of the conspiracy. The semi-automatic hybrid rifle-pistols are controlled for export to Russia (and Kyrgyzstan) under ECCN 0A501.a. On or about February 3, 2021, U.S. Company-1 received an export license from DOC to export over $800,000 worth of firearms and parts to Kyrgyzstan Company-1. The license stated that items within the scope of the license "may not be reexported or transferred (in-country)," subject to certain exceptions not applicable here. In connection with the license application, U.S. Company-1 submitted a "Letter of Explanation" to DOC stating that Kyrgyzstan Company-1 was the ultimate foreign consignee in Kyrgyzstan, and that Kyrgyzstan Company-1 would sell the proposed firearms shipments to "civilian end users for hunting, target shooting and competition purposes, in accordance with local regulations."

On or about May 25, 2021, Kyrgyzstan Company-2 (owned by Spouse-1) entered into a contract with Russian Company-1 (the Russian-partner company of Kyrgyzstan Company-1) for Kyrgyzstan Company-2 to sell "Goods" to Russian Company-1 in the amount of $10 million USD and noted that the "Goods" could be delivered in batches. The electronic contact information for Kyrgyzstan Company-2, listed an email address with the same last name and first initial as Spouse-1. The contract noted that the "Goods" would be described in an appendix. Based on the investigation, including additional documents summarized below, the "Goods" described in this contract appear to include the firearms that the defendant acquired on behalf of Kyrgyzstan Company-1 pursuant to the U.S. Company-1 Contract. It appears that Kyrgyzstan Company-1 is Zharnovnikov's company that transacts with U.S. companies, while Kyrgyzstan Company-2, which is fifty percent owned by Spouse-1, is the company that transacts with Russian companies. Criminals who seek to evade U.S. export control laws often use separate companies, like Kyrgyzstan Company-1 and Kyrgyzstan Company-2, to obfuscate from U.S. companies and authorities the true end destination of the goods being exported.

On or about April 11, 2022, the defendant signed an end use certification in connection with a separate license for U.S. Company-1 to export firearms and parts to Kyrgyzstan Company-1, which he provided to U.S. Company-1, who in turn provided it to DOC, that read:

> [Kyrgyzstan Company-1], a company registered for doing business in Kyrgyz Republic, agrees and understands that the products to be imported are authorized by the U.S. Government for export only to Kyrgyz Republic for the use of [Kyrgyzstan Company-1] under the proposed license. They may not be resold, diverted, transferred or otherwise be disposed of to any other country, either in their original

2

form or after being incorporated into other end items, without first obtaining approval from the U.S. Department of Commerce or use of an applicable exemption.

The listed firearms and parts ordered from [U.S. Company-1] will be used for commercial resale and warranties within Kyrgyz Republic for of sporting and hunting.

On or about July 2, 2022, the defendant emailed the following, which was in the Russian language, to a banker who uses a .kg (Kyrgyzstan) email address ("Individual-1): "[A]fter you transfer the money from [Kyrgyzstan Company-2]. Pay the Americans for the goods, I will attach the invoice in the next letter."[2] The defendant attached the U.S. Company-1 Contract.

Also on or about July 2, 2022, the defendant emailed Individual-1 the following, which was in the Russian language: "Make payment according to the invoice attached to the letter." The defendant attached a commercial invoice from U.S. Company-1 with invoice number 110021 (hereinafter the "U.S. Company-1 Invoice"). The U.S. Company-1 Invoice listed, among other things, 25 "[U.S. Company-1] Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD)" with 25 unique serial numbers.

The U.S. Company-1 Invoice included the following "Destination Control Statement":

These items are controlled by the U.S. government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or otherwise authorized by U.S. law and regulations.

A Kyrgyzstan Company-1 bank statement indicates that two days later, on or about July 4, 2022, Kyrgyzstan Company-2 sent $67,000 USD to Kyrgyzstan Company-1. The next day, on or about July 5, 2022, Kyrgyzstan Company-1 paid $65,564 USD—the same amount listed in the U.S. Company-1 Invoice—to U.S. Company-1. The stated purpose for the transfer was "payment for the U.S. Company-1 Invoice."

According to an EEI filing made on or about July 7, 2022, Company-1 exported semi-automatic rifles to Kyrgyzstan Company-1 pursuant to its February 3, 2021 export license on or about July 10, 2022. The port of export was John F. Kennedy International Airport, located in the Eastern District of New York. According to the EEI filing, the value of the export from U.S. Company-1 to Kyrgyzstan Company-1 was over $59,000. The EEI filing's corresponding license

---

[2]   Translations included herein are in draft form only.

3

application indicated that the firearms were for "commercial resale in Kyrgyzstan." The license stated:

> Items subject to the EAR and within the scope of this license may not be reexported or transferred (in country) unless such reexport or in-country transfer is (i) authorized by this license, or another license or other approval issued by the U.S. Government; (ii) authorized by a license exception or other authorization under the Export Administration Regulations (EAR); or (iii) to a destination, end user, and end use that would be "NLR" (No License Required) under the EAR.

A Kyrgyz customs document, located in the defendant's email account, dated July 29, 2022, details the importation of the firearms listed on the U.S. Company-1 Invoice, including the 25 serial numbers matching the U.S. Company-1 Invoice and the matching description as 25 "[U.S. Company-1]: Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD)," into Kyrgyzstan.

On or about August 8, 2022, Spouse-1 emailed the defendant an excel spreadsheet titled in the Russian language, "Supply [U.S. Company-1] ([Russian Company-1]) weapon numbers." Again, Russian Company-1 is a Russian company, and the DOC license did not authorize the export or re-export of the U.S. Company-1 firearms to Russia. The spreadsheet contained two columns, "Name" and "Number." The Name column lists "[U.S. Company-1]: Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD)," *i.e.*, matching the description in the U.S. Company-1 Invoice, and the "Number" column lists 25 serial numbers, again matching the U.S. Company-1 Invoice.

On or about November 14, 2022, the General Director of Russian Company-1 ("Co-Conspirator-1") executed a "DECLARATION OF IMPORT OF GOODS AND PAYMENT OF INDIRECT TAXES" (the "Import Declaration"), a form used between tax authorities of the member states of the Eurasian Economic Union, which includes both Kyrgyzstan and Russia. The Import Declaration was located in the defendant's email account. The Import Declaration listed the seller as Kyrgyzstan Company-2 and the buyer as Russian Company-1 with an address in Moscow, Russia, and identified the goods as 25 "[U.S. Company-1] Rifle/Semiauto/16" BRL/1*10rd mag/Cal 45ACP/BLK (MD)," *i.e.*, the same semi-automatic rifle-pistols that U.S. Company-1 exported to Kyrgyzstan Company-1, the defendant's company. The defendant did not apply for, obtain, or possess a license to export or re-export the semi-automatic pistol-rifles to Russia.

The defendant and Spouse-1 traveled from Kyrgyzstan to the United States on or about January 18, 2025, landing at Los Angeles International Airport. The defendant and Spouse-1 traveled to Las Vegas, Nevada, where they had a reservation at a hotel from January 20, 2025-January 24, 2025 and attended the SHOT Show. The defendant had a return flight scheduled for January 27, 2025. The defendant's business and travel suggest access to significant resources. As described above, the defendant appears to have significant means. Although the government does not have complete insight into his finances because his bank accounts are located abroad, his association with Kyrgyzstan Company-2, which has a $10 million contract with Russia

4

Company-1, and his $900,000 contract with U.S. Company-1, indicate that he has access to significant funds.

II.      Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

In addition, the Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). As discussed below, these factors weigh against pretrial release.

III.      The Statutory Factors Weigh Heavily in Favor of Detention

As set forth below, the factors to be considered in the detention analysis show that the defendant presents a significant flight risk.

First, the charged offense is serious. The defendant is charged in a transnational sanctions and export control evasion scheme. While the investigation is ongoing, the evidence amassed against Zharnovnikov is substantial, including, inter alia, (1) electronic communications among the defendant and his co-conspirators; (2) invoices, shipping documents, and other business records containing false information; and (3) bank and other financial records reflecting the establishment and use of multiple companies and illicit money movements. See, e.g., United States v. Fishenko, No. 12-CR-626, 2013 WL 3934174, at *2 (E.D.N.Y. July 30, 2013) (evidence of "pertinent recorded conversations and email exchanges that reveal [the defendant's] role in the conspiracy" weighed against release).

Second, the defendant faces a significant term of incarceration should he be convicted, which provides powerful incentive for him to flee. See, e.g., United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When the sentence . . . upon conviction is likely to be long . . . a defendant has stronger motives to flee."). Under the United States Sentencing Guidelines, the government estimates that the Base Offense Level applicable to the defendant is a 26, with a range of imprisonment of 63-78 months, assuming the defendant falls into Criminal History Category I and without factoring in any applicable enhancements or adjustments.

Third, the defendant has no ties to the New York area or the United States. Moreover, the United States would not be able to recapture the defendant were he able to enter the Kyrgyz embassy or consular facilities during his pretrial release, as law enforcement are prohibited from entering diplomatic facilities. Beyond this, the nature of the offense conduct, the

defendant's travel patterns, and his finances suggest that he has a network of overseas contacts and resources that he could leverage and use to facilitate his flight from the jurisdiction. Notably, during a U.S. Customs and Border Protection exam conducted on or about January 18, 2025, at Los Angeles International Airport, the defendant stated that in the last five years he had traveled to Austria, Belarus, Germany, India, Italy, Kazakhstan, Morocco, Portugal, Vietnam, Uzbekistan, the U.S., the United Arab Emirates, Turkey, Spain, Russia, and South Africa. Such extensive travel underscores that the defendant has means and is a significant flight risk.

IV.    Conclusion

For all of these reasons, the government respectfully submits that an order of detention pending trial is necessary to ensure that the defendant returns to court.

Respectfully submitted,

JOHN J. DURHAM
United States Attorney

By:    /s/ Ellen H. Sise
Ellen H. Sise
Assistant U.S. Attorney
(718) 254-7000


cc:    Clerk of Court (by ECF)
Defense Counsel (by ECF)